Scott, J.
The petition in error, in this case, seeks to reverse a judgment rendered by the district court of Hamilton county, in a cause which came into that court- by appeal from the judgment of the court of common pleas.
The first error assigned, relates wholly to an order of the *582 court of common pleas, made during tlie pendency of the case in that court, giving leave to prosecute the action in the name of the City Bank of New Orleans, the charter of which had then expired, for the use.of the State Bank of Louisiana, which claimed to be the assignee of the assets of the former corporation. The record shows that the defendant excepted' to this action of the court of common pleas. But upon appeal to the district court, the judgment of the court of common pleas, and its decisions upon questions of law, made while the case remained before it, were no longer in force; the whole case was to be tried de novo, and as though the district court had original jurisdiction of the action. We can not, therefore, look to alleged errors of the court of common pleas, from the effect of which the plaintiff in error escaped by his appeal, but must be limited to a review of the action of the district court, in which he complains of error having intervened.
But the question intended to be raised by this assignment, may, perhaps, be regarded as arising under the second error' assigned,’ which is, that the district court erred in receiving in evidence the assignment, purporting to have been executed by the president of the City Bank of New Orleans to the said Louisiana State Bank. And as the record shows, that the plaintiff in error claimed, in argument, upon the trial of the. case in the district court, that “ the corporate powers of the 'City Bank of New Orleans, having ceased by the expiration of her charter, by limitation, she no longer has any authority to sue or prosecute this action; and there is no one, or body corporate, named in the record, legally authorized to further prosecute this action,” we shall very briefly consider the /question thus presented.
The charter of the City Bank of. New Orleans expired by limitation on the 1st May, 1850; and the question whether a suit could be maintained in its corporate name after the expiration of its charter, under the laws of this state, was directly presented, to this court, when the same was before it in 1853; and it was then held that such suit could be maintained, in accordance both with the letter, and the- spirit and object of the *583 statutes of this state upon the subject. 2 Ohio St. Rep. 178, 174, 175. This decision was based on the effect of the act of March 12,1845, “ in relation to informations in the nature of quo warranto, and for other purposes” (2 Curwen, 1153), the act of March 10, 1843 (2 Curwen, 951), and the act of March 21, 1850, “in relation to judicial proceedings in favor of, and against dissolved corporations,” all of which were fully considered by the court. With the reasoning and conclusions of the court upon the effect of these acts, we are fully satisfied. But it is claimed, that the court overlooked the act of May 1,1852 (3 Curwen, 1876-77) “ to. provide for the adjustment and settlement of the affairs of incorporate associations and companies,” the first section of which reads thus:
“ That no suit, action, judgment, order, or decree to which any incorporated association or company of this state may be a party, either plaintiff or defendant, shall abate, be discontinued or dismissed, by reason of the expiration of the charter of such association or company; but that all such suits, actions, judgments, orders, or decrees shall proceed to final judgment, execution, satisfaction, or settlement, in the corporate name of such association or company.”
But an inspection of the subsequent sections of this statute will show that its main purpose was to furnish increased facilities to corporations of the state for adjusting and settling their affairs, by the appointment of trustees, etc.; it repeals no previous acts, and contains no provisions inconsistent therewith' — -but was merely in furtherance of their liberal and just design.
It is claimed, in the next place, that this action could not be prosecuted for the use of the State Bank of Louisiana, because the assignment was made to it by the president of the City Bank of New Orleans, in pursuance of a resolution of the board of directors of the latter bank, which was not authorized by its stockholders; and, secondly, because the acceptance of the assignment is not shown to have been sanctioned by the ' stockholders of the State Bank; and, thirdly, because the State Bank of Louisiana had no capacity to receive by assignment the assets of another banking company.
*584 The validity of this assignment, and the right of the State Rank of Louisiana, to prosecute the action in the name of the City Bank of New Orleans, must necessarily have been involved in the former presentation of the case to this court, and seem to have been then unquestioned. The charter of the City Bank had then expired, and the counsel for the State Bank of Louisiana, were cited, appeared and defended the writ of error, in virtue of the same assignment, the validity of which is now drawn in question. Nor do we see sufficient reason to question its validity. If it was within the corporate power of the City Bank to assign its effects and within that of the State Bank to receive and accept the assignment, we think there qan be no question that the board of directors of the respective institutions were the proper authorities through whom these powers were to be exercised. They were elected by the stockholders of these corporations, respectively, for the transaction of business affairs within the legitimate power of the corporations, and their acts, within the scope of the corporate powers would bind the stockholders. The assignment was made April 27, 1850, three days before the expiration of the charter of the City Bank, and was manifestly intended for the legitimate purpose of settling up the unclosed business of the City Bank, and rightfully distributing its assets; and we find no provision in its charter, and are aware of no principle of public policy, to forbid an act apparently so necessary and just.
In regard to the capacity of the State Bank to purchase, and receive and hold by assignment, the assets of the City Bank, we think it clear that ample power for that purpose was conferred by the second section of its charter, by which it was authorized “ at any time, to buy, receive and possess all kinds of property, either real or personal, and to loan, negotiate and dispose of the same, by taking mortgages and by discounting on banking principles, on such security, and at such credit as they shall think advisable, provided it does not exceed in value the double of their capital; and they shall have the power of selling, transferring, and renting said property, and, in short, to enjoy and dispose of it, at their own *585 pleasure and discretion,” etc. The fifteenth section of the charter, it is true, limits this general power, by providing that “ the lands, effects, goods or merchandise whatsoever, which the said corporation shall hold, shall be only such as shall be requisite for the convenient transaction of its business, and such as shall have been bona fide mortgaged or pledged to it by way of satisfaction of debts previously contracted.” These sections evidently gave the bank full power to acquire and hold property of every kind, convenient for the transaction of banking business, or obtained as a security for debts, and were certainly designed to interpose no ob stacle to the safe and convenient discharge of all the proper functions of a banking institution, but only to prohibit the bank from engaging in business wholly foreign from the objects and business contemplated by its charter. The assignor and assignee were both corporations of the same kind, engaged in a similar business, and chartered for similar purposes. The assets transferred were such as related to a banking business, consisting of deposits, bills discounted, securities, etc., and the assignment contemplated and provided for such business transactions only, by. the State Bank, as it would have been competent and proper for the City Bank to transact in the regular course of its business as a bank, had it continued in existence, without assignment. Both the parties were authorized to deal in the various kinds of property embraced in the schedule, and we find no provision in the charter of either prohibiting the transaction.
Nothing appears in the assignment, creating a trust in the State Bank of Louisiana. On the contrary, it purports to be an absolute sale and transfer, by the City Bank, of all its assets, consisting of promissory notes, bills of exchange, drafts, acceptances, etc., debts due to the bank and secured by mortgages, sundry state bonds, certain specified unadjusted claims, all its specie, bullion and bank notes of specie paying banks, balances due from other banks, etc., of all which full schedules are appended, showing the items and estimated value of each of the classes of property transferred. In consideration whereof the State Bank binds itself, uncon *586 difcionally, to pay dividends .remaining unpaid to the stockholders of the City Bank, the amounts due to its depositors, and to other banks; to redeem its outstanding circulation; pay to its stockholders, severally, one hundred dollars on each share of stock, etc. The -City Bank, at the same time, warrants the several classes of liabilities, thus assumed by the State Bank, not to exceed certain specified amounts. And there is no evidence tending to show that a trust was intended by the parties. It is, therefore, unnecessary to consider the effect of that provision in the Louisiana code which declares a corporation incompetent to fulfill a personal trust.”
The character of the assets purchased, is such as would render them, apparently, “convenient” in the transaction of. a banking business. Nothing could be better adapted to the successful prosecution of that branch of business than a liberal supply of deposits, bullion and coin. The remaining assets were in the same line of business.
We see no reason to doubt, that the effect of this transfer was, at least, to make the State Bank of Louisiana, an assignee within the meaning of the statutes of this state, so as to authorize the prosecution of this action, for its use.
We proceed, then, to the consideration of the third error assigned, which is : “ That the court erred in receiving in evidence, at the trial, two certain books of account, purporting to be books of the branch of the City Bank of New Orleans, at Natchitoches.”
It appears, from a bill of exceptions' taken on the trial, that “ the plaintiff produced and offered in evidence two certain books of account, purporting to be the books of the branch of the City Bank of New Orleans, at Natchitoches, one of them being a ledger and the other a journal, without any further proof in relation to the same than is contained in the depositions hereinafter mentioned, to the reception of which said books in evidence, the defendant objected. It was not shown, outside of the said books, that either of them was a book of original entries; nor that the several entries therein were made at the times of their respective dates, or contemporaneously with the several transactions which they pur *587 ported to record. But the court overruled the said objection, and admitted the said books in evidence.”
The depositions referred to in this bill of exceptions are appended thereto, and show the books in question to be the ledger and journal of the branch bank at Natchitoches, and that the portions of them offered in evidence, and admitted by the court, were entries made by Hyde'himself, or at least under his supervision, the entries therein appearing in a different handwriting having been excluded by the court. Entries made by him during his term of office, as cashier, in these books, which it was his duty as such cashier to keep, were clearly admissible in evidence, whether the books were those of original entries or otherwise. They were competent evidence, because made by himself, in the discharge of the very duties, for the faithful performance of which the plaintiff in error stood answerable. They were not books of account kept by another against Hyde, but they were his own official acts, and so far as. they were shown to be his own entries, and made while in office, they were clearly competent evidence both as against himself and his sureties.
The fourth error assigned is : “ That the said court erred in receiving in evidence, at the trial, so much of the deposition of Charles Augustus Frederic Rondeau as contained conclusions, deductions and opinions of the witness drawn from, or founded upon, the books of the branch bank at Natchitoches, and other books, papers and memoranda.”
The deposition's appended to the bill of exceptions show that E. Hyde, jr., the principal in the bond sued upon, died in the summer of 1853. Whether his verbal admissions, made in the settlement of his accounts with the plaintiff, and proved by these depositions, were competent evidence against his sureties, is a question not before us. Upon the motion of the plaintiff in error, all these admissions were, upon the trial excluded. And of this he has no reason to complain.
A written statement of the amount and items of Hyde’s defalcation, drawn up and signed by him, at the time of Rondeau’s examination of the accounts, and referred to in his *588 depositions, as paper “A,” was also excluded by the court It is, therefore, equally unnecessary for us to express an opinion whether this evidence did not become competent, upon the death of Hyde.
But the objection to be considered, is limited to so much of the depositions of Rondeau as consist of his “ conclusions, deductions and opinions,” drawn from or founded upon the books of the bank, and other books, papers and memoranda. But we think there is nothing in the depositions of Rondeau which requires ús to determine to what extent, and under what circumstances, the conclusions of an expert, founded upon an examination of books and papers, may be substituted, as evidence, for the books and papers themselves. In the present case the boolcs themselves were before the court, and, in evidence. And we find nothing in the depositions of Rondeau, which purports to be a mere statement of results, collected by him as an accountant, from an examination of the books, papers, etc. On the contrary, his evidence consists mainly in a direct impeachment of the accuracy of the accounts, as exhibited by the books, and 'that based upon his personal knowledge of facts outside of the books. While the books could only show, if correct, the amount of cash which should have been on hand, Rondeau testifies to the amount actually produced by Hyde, and proceeds to state the extent of the defalcation ; referring, by way of corroboration, to the page of the ledger in which the cash account will be found exhibiting the amount which ought to have been on hand. The ledger being in evidence, we can not see that such a reference to it, could be improper. Rondeau farther testifies that two items appearing in the books as kept by Hyde, and to which special reference is made, were false or improper entries. One of these was a credit entered to his cash account for $1511 45, as paid by him to the parent bank at New Orleans, while this amount was simply the proceeds of sales of cotton belonging to the parent bank, which were paid to Hyde, and not charged by him to the account of the branch bank. The other item was a credit entered to his cash account of $1087 72 as paid by him to the -parent bank, *589 when the same was, in fact, moneys received by him from B. B. Brazeale, on account of his indebtedness to the City Bank of New Orleans, and for which no credit was given by Hyde to said Brazeale, and no charge entered therefor against the branch at Natchitoches. These items, Rondeau impeaches as false, from his knowledge outside of the books, and he states the facts which show them to be improper. This is evidently a very different thing from conclusions drawn from an examination of the books; and was, in our judgment, competent evidence.
Rondeau farther deposed, that said Hyde had charge of the renting of a house in Natchitoches, belonging to the plaintiff, and received as rent therefor $522, less $81 expended in repairs, with which he entirely failed to charge himself; and after stating this fact as'within his own knowledge, he adds, by way of corroboration, that he had seen the receipt given by Hyde for this sum in the hands of the tenant, A. H. Pier-son. This testimony, in regard to the contents of a receipt, which the witness had seen in the possession of a third party, was, no doubt, incompetent; and had the attention of the court been called to it, by special objection, it would, probably, have been excluded. But this was the statement of a fact, and not of a deduction or conclusion, and does not appear to have been objected to. It is quite possible, that a full examination of the witness might have shown that he know nothing of Hyde’s having received money as rent for the house occupied by Pierson, excepting what he learned from the receipt shown him by Pierson, and from the admissions of Hyde. But the fact is not so stated in Rondeau’s deposition, and it is certainly possible that the witness may have had personal knowledge of the payment' of rent by Pierson to Hyde. It is not probablé that the objection, stated as it is in general terms, was understood in the court below as applying to this part of the deposition. We find nothing farther in the depositions of Rondeau, the competency of which appears even questionable, after discarding all the admissions of Hyde, which were rejected.
It is claimed, in the fifth place, that the court erred in *590 holding that the plaintiff was entitled to recover the whole amount of the defalcation proved, not exceeding the sum of $2500. But in so holding, we think, the court did not err. The defendant’s liability, as surety, was several and not joint. And whatever may be his rights or remedies against the other sureties under the sections of the Louisiana code, which were offered in evidence, we do not think they affect the right of the plaintiff to recover from the defendant to the full extent of his several obligation. As against the plaintiff, the articles cited refer clearly to a case of joint suretyship.
Lastly, it is claimed that the evidence in the case does not show a defalcation on the part of Hyde, to the extent of $2500, and that a new trial should have been allowed for that reason.
The journal and ledger were both in evidence in the court below, but their contents are but partially disclosed by th‘e record. It is fair to presume, however, that had the state of the cash account, as exhibited by the entries made therein ■by Hyde himself, differed from the statement made by Rondeau in his reference thereto, the fact would have been sho.wu by the bills of exception. If the defalcation thus shown by ■the books, as kept by Hyde while in office, be increased by the amount of the credits falsely entered, as testified to. by Rondeau, from his personal knowledge, the aggregate amount would largely exceed the sum of $2500, without including the rent said to have been received from the tenant. And this would be the case, after deducting the additional credits given to Hyde in the statement contained in paper “A.” There was no evidence showing how much, if anything, had been collected from the other sureties in Louisiana, and on this point the burden of proof was on the defendant.
Judgment of the district court affirmed. ■
Sutliee, C.J., and Peck and Brinkerhoee, J J., concurred.
GholSON, J., did not sit in this case, having formerly been of counsel.